MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2021 ME 23
Docket:      Pen-20-189
Argued:      February 11, 2021
Decided:     April 20, 2021

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, and HORTON, JJ.

CITY OF OLD TOWN

v.

EXPERA OLD TOWN, LLC

GORMAN, J.

[¶1] The City of Old Town appeals from a judgment entered in the Superior Court (Penobscot County, *Anderson, J.*) affirming a 2019 decision of the State Board of Property Tax Review. The Board's 2019 decision, which granted the tax abatement requests of Expera Old Town, LLC, for the 2014 and 2015 tax years for a wood pulp and paper mill commonly known as the Old Town Mill, was issued after the Superior Court vacated and remanded the Board's original 2017 decision affirming the City's assessments. The City argues that, because the Board was not compelled on the record before it to find that the City's assessment substantially overvalued the Mill, the Board's 2017

2

decision was not manifestly wrong, and the Superior Court therefore erred in vacating it.[1]  We agree and vacate the Superior Court's judgment.

## I. BACKGROUND

[¶2]  The following facts, which are not disputed, were found by the Board in its 2017 decision and are supported by evidence presented to the Board during a five-day testimonial hearing.  In October of 2008, Red Shield Acquisition, LLC, a subsidiary of Patriarch Partners, purchased the Mill for $18,875,000 at a bankruptcy sale.  As part of the purchase, Red Shield entered into a Combined Real Estate Mortgage and UCC Article 9 Personal Property Security Agreement (CSA) with Patriarch Partners Agency Services, LLC (PPAS) (another subsidiary of Patriarch Partners) to secure cash advances to Red Shield.  The Mill remained operational for nearly seven years until, in July of 2014, Red Shield shut down the Mill due to an economic downturn.  In August of 2014, Red Shield began marketing the Mill for sale.  At that time, PPAS was Red Shield's primary creditor.

---

[1]  The City also argues that, on remand, the Board erred by adopting the 2014 bankruptcy sale price as the fair market value of the property for both the 2014 and 2015 tax years, and that the Board's decision was not legally valid because critical elements of the Board's 2019 decision on remand were supported by a vote of only two members of a five-member panel.  Because we are affirming the Board's 2017 decision, we do not reach these issues.

[¶3]   In August of 2014, PPAS foreclosed on the portion of the CSA involving the Mill's personal property, thereby acquiring title to that property in partial satisfaction of the cash advance made to Red Shield.  Before PPAS was able to proceed with a foreclosure on the real property, creditors other than PPAS filed an involuntary petition for Chapter 7 bankruptcy against Red Shield.

[¶4]  While this was unfolding, Expera Specialty Solutions, which owns four paper mills in Wisconsin, became aware that the Mill was for sale.  In October of 2014, Expera Specialty Solutions' vice president of operations participated in a limited due diligence review of the Mill that included an eight-hour walk-through of the property.  On December 4, 2014, Expera Old Town—a subsidiary of Expera Specialty Solutions—purchased the Mill for $10.5 million with the approval of the United States Bankruptcy Court for the District of Maine.  The purchase price consisted of $7.3 million in cash plus an estimated $3.2 million of specified assumed liabilities.

[¶5] Expera Old Town's plan for the Mill was to convert it from hardwood pulp production to softwood pulp production.  Although Expera Old Town did not anticipate making a profit in its first year, it did expect to get the Mill up and running within the first part of 2015.  The start-up, however, was complicated and stalled by extreme cold weather and equipment failure.  After numerous

4

delays the conversion to producing softwood pulp finally began and, by September of 2015, the Mill was producing 400 to 450 tons per day. At the same time, however, the price for softwood pulp was decreasing and Expera Old Town concluded that it could not continue to operate the Mill without taking huge losses. Expera Old Town shut down the Mill in October of 2015. In January of 2016, Expera Old Town sold the Mill for $2.5 million, with the understanding that it would be scrapped.

[¶6] The City's assessor originally assessed the Mill at around $51 million for the 2014 tax year. The City then contracted with MR Valuation (MRV) to assist it in reviewing the assessment of the Mill property for the 2014 tax year and in determining the value of the Mill property for the 2015 tax year. In July of 2015, MRV issued a report that stated that the fair market value of the Mill was $19,560,000 for the 2014 tax year and $30,860,000 for the 2015 tax year. The City's assessor accepted MRV's appraisal for the 2014 tax year and reduced MRV's suggested value to $25,354,400 for the 2015 tax year after accounting for additional exemptions. Expera Old Town requested tax abatements for 2014 and 2015, but the City denied the requests. Expera Old Town appealed the denial of its requested abatements to the Board. *See* 36 M.R.S. §§ 271(2)(A)(3); 843(1-A) (2021).

[¶7]  Between August of 2016 and February of 2017, the Board held a five-day evidentiary hearing on Expera Old Town's appeals.  At the hearing, Expera Old Town offered an appraisal developed by the valuation firm of Duff & Phelps that set the value of the Mill at $10.5 million for the 2014 tax year and $10 million for the 2015 tax year.  To support that appraisal, Expera Old Town presented evidence and witnesses, including Expera Specialty Solutions' vice president of operations and two valuation experts from Duff & Phelps.  The City offered, among other evidence, the appraisal developed by MRV and testimony of two valuation experts from MRV.

[¶8]  In a twenty-page decision issued April 27, 2017, the Board reduced the City's 2014 tax year assessment from $19,560,000 to $16,963,112 to account for the required exclusion of exempt personal and real property, and accepted the City's $25,354,400 assessment for the 2015 tax year.

[¶9]  The Board then explained that Expera Old Town had failed to meet its burden of proving that the assessments were "manifestly wrong."  In explaining why it found Duff & Phelps's heavy reliance on the 2014 bankruptcy sale of the Mill "as market evidence of value as a comparable sale . . . flawed and not credible," the Board pointed out that (1) in comparison to the situation in December of 2014, "the [M]ill was operating as of April 1 [in] both tax years,"

6

and by September of 2015 it "had fully converted to softwood production and was producing . . . within its design capacity of 400 [to] 500 tons per day"; (2) the appropriate exposure time for selling a property like the Mill was between twelve and twenty-four months, "which was cut short . . . by an involuntary or forced petition for Chapter 7 bankruptcy"; (3) Expera Specialty Solutions' vice president of operations viewed the Mill for only eight hours before the Mill was purchased; and (4) "the sale price . . . included items not directly related to the fair market value of real and personal property assets such as employee payments, and liabilities for specified environmental settlements." The Board also rejected or discounted Duff & Phelps's application of the sales approach generally and described its application of the cost approach[2] to be "arbitrary and not credible."[3] Based on these findings, the

---

[2] We have recognized three methods for calculating fair market value: (1) the comparative, market data, or sales approach; (2) the income or capitalization approach; and (3) the cost approach. *See Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384, 390 (Me. 1981).

[3] Specifically, the Board concluded as follows:

In connection with Duff & Phelps'[s] application of the sales approach generally, the Board finds that the report does not adequately explain adjustments made to sales when applying the three factors used to compare a sale to the [Mill]. . . . [F]or example, . . . "market conditions"—one of the three factors—is not well defined and the reason for applying an adjustment for that factor is not adequately set forth in the reports. In particular, Duff & Phelps concludes that the "market condition" of a sale may be "equal" to the [Mill] but does not explain in the reports the reason or reasons for that conclusion. [F]or example, the reports do not explain whether a particular property was operating, or not, at the time of the sale. Indeed, Duff & Phelps uses the bankruptcy sale of the [Mill] in 2008 as a comparable for both tax years, but describes the market for that sale as "equal" for [the] 2014 tax year and "superior" for the

Board affirmed the City's assessments of $16,963,112 for the 2014 tax year and $25,354,400 for the 2015 tax year.

[¶10]  Expera Old Town appealed the Board's decision to the Superior Court.  *See* 36 M.R.S. § 271(7) (2021); *see also* 5 M.R.S. § 11001 (2021); M.R. Civ. P. 80C.  Although the court summarily rejected most of Expera Old Town's claims of error,[4] the court, citing our decision in *Terfloth v. Town of Scarborough*, 2014 ME 57, 90 A.3d 1131, concluded that the City's assessment did not assign sufficient weight to the 2014 bankruptcy and 2016 liquidation sales of the Mill.  The court vacated the Board's decision and remanded the case to the Board with instructions to give "real weight to the 2014 and 2016 sales of the Mill."  *See* 36 M.R.S. § 843(1-A).

[¶11]  On remand from the Superior Court, the Board determined by a vote of two to zero with one abstention that the 2014 bankruptcy sale was an arm's-length transaction, and by a vote of three to zero that "the market for softwood pulp had not changed in any material way" between the date of the sale and the April 1, 2014, and April 1, 2015, valuation dates.  The Board further

[2015] tax year, thereby making a different adjustment in relation to the [Mill] from one year to the next for that factor without adequate explanation.  Ultimately the Board finds that there is not enough information to justify the adjustments made by Duff & Phelps for both tax years.

4  Expera Old Town does not pursue any of those claims here.

8

determined by a vote of two to one that the 2016 liquidation sale was an arm's-length transaction, but that "the market had materially changed between April 1, 2014 and January [of] 2016," rendering the sale "irrelevant." The Board then concluded by a vote of three to zero that the value of the property was $10.5 million for the 2014 tax year. By a vote of two to one, the Board concluded that the value of the Mill for the 2015 tax year was also $10.5 million.

[¶12] The City appealed the Board's 2019 decision to the Superior Court, and the court affirmed that decision. *See* 36 M.R.S. § 271(7); *see also* 5 M.R.S. § 11001; M.R. Civ. P. 80C. The City timely appealed. *See* 14 M.R.S. § 1851 (2021); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

A. Standard of Review

[¶13] Where "the Superior Court act[s] as an intermediate appellate court, we review directly the Board's decision for abuse of discretion, error of law, or findings unsupported by substantial evidence in the record." *Town of Southwest Harbor v. Harwood*, 2000 ME 213, ¶ 6, 763 A.2d 115. In the present case, there are two decisions of the Board—one before and one after the Superior Court's remand. "Underlying our doctrine identifying the operative decision for review is the aim that the operative decision represent the decision

of the original fact-finding tribunal." *Friends of Lamoine v. Town of Lamoine*, 2020 ME 70, ¶ 2-3, 18 n.6, 234 A.3d 214. Here, the operative decision for our review is the Board's initial decision in 2017, including its original fact-finding.

[¶14] "In an abatement proceeding, the Board must undertake its responsibilities in two parts." *Harwood*, 2000 ME 213, ¶ 7, 763 A.2d 115. First, the Board, beginning with the presumption that a municipality's property valuation is valid, determines whether the taxpayer has overcome that presumption and shown "that the assessed valuation in relation to just value is manifestly wrong." *Great N. Nekoosa Corp. v. State Tax Assessor*, 522 A.2d 1316, 1317 (Me. 1987); *see Harwood*, 2000 ME 213, ¶ 7, 763 A.2d 115. "If the taxpayer presents sufficient evidence to meet [its] burden, and the Board is convinced that the assessed value was manifestly wrong, then the Board has the responsibility to undertake its own determination of [fair market] value and to grant such reasonable abatement as the board thinks proper." *Harwood*, 2000 ME 213, ¶ 7, 763 A.2d 115 (quotation marks omitted); *see Weekley v. Town of Scarborough*, 676 A.2d 932, 934 (Me. 1996).

[¶15] To meet the initial burden of showing that an assessment was manifestly wrong, the taxpayer must demonstrate

> (1) that [the taxpayer's] property was substantially overvalued and an injustice resulted from the overvaluation;

(2) that there was unjust discrimination in the valuation of the property; or

(3) that the assessment was fraudulent, dishonest, or illegal.

*Terfloth*, 2014 ME 57, ¶ 12, 90 A.3d 1131.

[¶16]  Because the Board concluded that Expera Old Town had failed to meet its initial burden of showing that the assessments were manifestly wrong, we will vacate that determination "only if the record compels a contrary conclusion to the exclusion of any other inference." *Id.* ¶ 13 (quotation marks omitted).

B.     Fair Market Value

[¶17]  The City argues that the record from the 2017 Board decision does not compel the conclusion that Expera Old Town met its initial burden of showing that the assessments were manifestly wrong and that it was therefore an error for the Superior Court to vacate that decision and remand for the Board to give the 2014 bankruptcy and 2016 liquidation sales "real weight."  Expera Old Town argues that the Board failed to make a specific finding as to whether the 2014 bankruptcy and 2016 liquidation sales of the Mill were arm's-length transactions, and thereby failed to assign the proper weight to the sales in

determining the fair market value of the Mill for the 2014 and the 2015 tax years as required by our decision in *Terfloth*. *See id.* ¶ 19.

[¶18] "[T]he status of all taxpayers and of such taxable property must be fixed as of [the first day of each April]." 36 M.R.S. § 502 (2021). The Maine Constitution provides that "[a]ll taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof." Me. Const. art. IX, § 8. "'Just value' means [fair] market value." *Weekley*, 676 A.2d at 934. Fair market value is "the price a willing buyer would pay a willing seller at a fair public sale," *Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384, 394 (Me. 1981), and we have repeatedly held that a recent sale of a property is probative of its fair market value, *see, e.g.*, *Terfloth*, 2014 ME 57, ¶ 11, 90 A.3d 1131; *McCullough v. Town of Sanford*, 687 A.2d 629, 631 (Me. 1996).

[¶19] Contrary to Expera Old Town's contentions, however, reliance on a recent sale price in determining the just value of a property for purposes of a property tax assessment is based upon the assumption that the sale in question was not only an arm's-length transaction but was a bona fide sale under normal market conditions, such that it can be said to reflect what a willing buyer would pay a willing seller on the open market. *See Shawmut Inn*, 428 A.2d at 395

("In the case before us we cannot give the . . . sale price the controlling weight for which [the taxpayer] contends. . . . [T]he sale was consummated between shareholders in a close corporation. We have no way of knowing what price the same property might have brought had it been offered for public sale."); *Arnold v. Me. State Highway Comm'n*, 283 A.2d 655, 659 (Me. 1971) (concluding that "a material change in the economy of the area involved or the pressures that the owner may be under compelling him to sell" may indicate that the sale price is not "conclusive evidence of fair market value").

[¶20] Expera Old Town's singular focus on the Board's alleged failure to determine whether the sale of the Mill was an arm's-length transaction misses the mark. It is true that, in *Terfloth*, our determination of whether a recent sale of subject property was indicative of fair market value was focused solely on whether the sale was an arm's-length transaction. 2014 ME 57, ¶ 14, 90 A.3d 1131. That focus, however, was due to the Board's finding that the sale had not been an arm's length transaction after the assessor discounted a recent sale because he found—without any support in the record—that the price paid was "in th[e] range of foreclosure sales." *Id.* ¶ 17 (quotation marks omitted). We concluded that although "the price from an arm's-length sale is [not] dispositive of a property's fair market value, the Board's factual error regarding the

arm's-length nature of [the taxpayer's] purchase caused it to give too little weight to the sale price as representative of the property's fair market value," and that the conditions surrounding the sale "compel[led] the conclusion that the property [was] substantially overvalued and an injustice ha[d] resulted." *Id.* ¶ 19 (quotation marks omitted). The crux of the holding in *Terfloth* is simply that the price obtained through a recent sale may be very convincing evidence of that property's value, provided that the sale was made at arm's length *and* occurred under regular market conditions in an open market. *Id.* ¶¶ 18-19.

[¶21]  Expera's argument that the Board did not make findings as to whether the 2014 bankruptcy and 2016 liquidation sales were arm's-length transactions is a red herring.  Unlike in *Terfloth*, the issue here is not whether the 2014 and 2016 sales of the Mill were arm's-length transactions, *id.* ¶ 14, but more broadly, whether the sale prices of $10.5 million in 2014 and $2.5 million in 2016 were accurate or generally accurate representations of the fair market value of the Mill as of April 1, 2014, and April 1, 2015.  *See* 36 M.R.S. § 502; *see also Shawmut Inn*, 428 A.2d at 395; *Arnold*, 283 A.2d at 659.

[¶22]  The Board's findings "must be adequate to indicate the basis for the decision and to allow meaningful judicial review."  *Carroll v. Town of Rockport*, 2003 ME 135, ¶ 27, 837 A.2d 148.  Nevertheless, "[i]f there is

14

sufficient evidence on the record, the Board's decision will be deemed supported by implicit findings." *Forester v. City of Westbrook*, 604 A.2d 31, 33 (Me. 1992); *see also Harwood*, 2000 ME 213, ¶ 21, 763 A.2d 115 ("When a Board is presented with evidence, it may accept parts of the evidence and reject other parts.  It is not required to engage in an all or nothing fact-finding." (citation omitted)).

[¶23]  In its 2017 decision, the Board clearly found that the 2014 bankruptcy sale was *not* an accurate representation of the fair market value of the Mill as of April 1, 2014, and April 1, 2015, precisely because Expera Old Town purchased the property while its owner was facing an involuntary creditors' petition in the bankruptcy court, the Mill was no longer operating, the sale occurred after a truncated marketing period, the seller performed only a very limited due diligence, and "the sale price ultimately included items not directly related to the fair market value of real and personal property assets."

[¶24]  Based on these findings, the Board declined to give the 2014 bankruptcy sale price the controlling weight demanded by Expera Old Town. Although the record does contain some evidence suggesting that the 2014 bankruptcy sale price *was* indicative of the Mill's fair market value, the Board

was free to resolve this factual dispute in favor of the City. *See McCullough*, 687 A.2d at 631.

[¶25]  As to the 2016 liquidation sale of the Mill, the Board found that "[s]ome [twenty] parties, mostly scrap dealers, expressed interest in buying the [M]ill.  No one expressed interest in running the [M]ill, which Expera sold in January 2016 for $[2.5] million with the understanding that the [M]ill would be scrapped."  Although the Board made no explicit findings of fact related to whether the 2016 liquidation sale was an accurate or generally accurate representation of the fair market value of the Mill at the time of the tax assessments in 2014 and 2015, it did describe the types of bids and the bidders' perception of the Mill as "scrap."  As of April 1, 2014, nearly two years earlier, the Mill had been operating.  As of April 1, 2015, the Mill had been purchased by Expera Old Town, and was on its way to becoming fully operational again. Given the substantial amount of time that had passed between the 2014 and 2015 assessment dates and the 2016 liquidation sale, *see* 36 M.R.S. § 502, it requires no leap of logic to determine that the Board implicitly decided that the 2016 liquidation sale was not indicative of the Mill's fair market value. *See Forester*, 604 A.2d at 33.

16

[¶26] Because the record in this case does not compel the conclusion that the Mill was assessed in excess of its just value to the exclusion of any other inference, Expera Old Town failed to meet its initial burden of showing that the assessments were manifestly wrong. *See Terfloth*, 2014 ME 57, ¶¶ 12-13, 90 A.3d 1131. For these reasons, we vacate the Superior Court's judgment and remand this action to the Superior Court with instructions to affirm the Board's 2017 decision.

The entry is:

> Judgment vacated. Remanded to the Superior Court with instructions to affirm the Board's 2017 decision.

---

Edmond J. Bearor, Esq., and Jonathan P. Hunter, Esq. (orally), Rudman Winchell, Bangor, for appellant City of Old Town

Jonathan A. Block, Esq. (orally), and Olga J. Goldberg, Esq., Pierce Atwood LLP, Portland, for appellee Expera Old Town, LLC

Susanne F. Pilgrim, Esq., Maine Municipal Association, Augusta, for amicus curiae Maine Municipal Association

Penobscot County Superior Court docket number AP-2019-17
FOR CLERK REFERENCE ONLY